# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2007

## STATE OF TENNESSEE v. CHRISTOPHER CARTER

**Appeal from the Criminal Court for Shelby County**
**No. 05-05922    Chris Craft, Judge**

---

**No. W2006-02124-CCA-R3-CD   -   Filed November 15, 2007**

---

A Shelby County grand jury indicted the defendant, Christopher Carter, on five counts of aggravated assault.  Following a jury trial, the defendant was convicted of one count of aggravated assault, a Class C felony, and one count of assault, a Class A misdemeanor.  The state dismissed the remaining counts, and the trial court sentenced the defendant to fifteen years in the Department of Correction as a career offender.  On appeal, the defendant contends that the evidence produced at trial was insufficient to support the jury's guilty verdicts.  After reviewing the record, we conclude that the evidence produced at trial was sufficient to support the defendant's convictions, and we therefore affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Robert Wilson Jones, District Public Defender; Garland Ergüden (on appeal) and Diane Thackery (at trial), Assistant District Public Defenders, for the appellant, Christopher Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; William A. Tillner, Assistant Attorney General; William L. Gibbons, District Attorney General; Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At trial, Officer Ronnie Payne with the Memphis Police Department testified that on June 15, 2005, while off duty, he and other members of a local recreational softball team, who had just

finished a game, went to the Arbors Apartments in Memphis to socialize. At some point that night, Officer Payne witnessed a black pickup truck with its lights turned off moving quickly through the parking lot. A short time later, Officer Payne saw the truck again, this time with its lights turned on, moving quickly around a circular driveway. Officer Payne testified that he saw another car pull slightly out of a parking spot and then pull back in, as if the driver was attempting to reposition the car within the space. Officer Payne saw the truck, driven by the defendant, almost hit the other vehicle as it was backing out. The truck remained stopped near the other vehicle. Officer Payne heard the two drivers, who initially remained in their vehicles, exchange words. The officer did not hear the exact words that were exchanged, but he did note that the two drivers appeared angry with each other. After a while, the defendant attempted to exit his truck; at that point, Officer Payne approached the truck in an attempt to "deflect the problem that was about to occur."

Officer Payne stated that as he approached the vehicle, he calmly told the defendant, "[i]t's not that big of a deal. Let it go." He stated that during the initial confrontation with the defendant, he did not identify himself as a police officer, though one of the three other softball teammates who were still in the parking lot at the time of the incident may have indicated that Officer Payne was a police officer. Officer Payne attempted to close the vehicle's door a few times, with the defendant attempting to keep the door open each time. After a while, the defendant began arguing with Officer Payne, using numerous obscenities and racial slurs during the argument. Officer Payne soon saw the defendant reach into his pants pocket. Thinking that the defendant was reaching for a knife, the officer slammed the door on the defendant's leg and stepped away from the truck. The defendant then exited the vehicle with a knife in his hand. The officer then noticed a metal frame, which he said looked like the bottom of a lawn chair, in the bed of the defendant's truck. Officer Payne grabbed the metal frame and swung it at the defendant in an attempt to repel the defendant's advances. The frame was rather light, and it flew out of Officer Payne's hands when he swung at the defendant. The defendant kept advancing toward Officer Payne, and the officer grabbed the defendant's arm and took him to the ground. As Officer Payne grabbed the defendant's arm, the defendant stabbed the officer in the shoulder.

After the two men fell to the ground, Officer Payne ran to his apartment and grabbed his police-issued firearm. He then returned to the parking lot, where the defendant was still standing, knife in hand. Officer Payne then identified himself as a police officer, pointed his gun at the defendant, and ordered the defendant to drop his knife. After giving this command three times, the defendant dropped his knife, entered his truck, and drove away. The officer chased the defendant on foot, caught up to the defendant before he exited the apartment complex, and ordered him to exit his truck. The defendant instead drove to the other end of the complex. Officer Payne did not chase the defendant further and was not present when police later apprehended the defendant. On cross-examination, Officer Payne testified that while he pointed his gun at the defendant, a woman stepped between the two men and told the defendant to drop his knife.

Joshua Head testified that on the evening of June 15, 2005, after a softball game, he was in

the parking lot at the Arbors Apartments when he noticed a truck, driven by the defendant, exit a handicapped space and drive rapidly around a circular driveway. He noticed a woman driving another car back out of her parking space and then pull back in, as if she were rearranging her car within the space. The defendant slammed on his brakes and stopped in front of the car. Both drivers "laid down on the[ir] horn[s]" before the defendant sped around the driveway and again stopped in front of the other vehicle. Head testified that at that point, Officer Payne decided to approach the two vehicles "because there [were] a bunch of kids and people out there." Head and at least two other people also approached the scene but stopped a short distance away from where the two vehicles were stopped. Head testified that Officer Payne attempted to shut the defendant's truck door and calmly told the defendant to leave. The defendant did not leave, instead calling Officer Payne a "f—ing n—r" and hurling other obscenities and racial slurs toward the officer. After a while, Head grabbed Officer Payne from behind and pulled him away from the defendant's truck. At that point, Head saw the defendant emerge from his truck with a knife. Officer Payne pushed Head away from the truck before grabbing a metal object from the back of the defendant's truck and swinging it at the defendant. Head then saw the defendant stab Officer Payne as the two men fell to the ground. Officer Payne then ran to his apartment.

Head testified that after Officer Payne went to his apartment, he saw the defendant "go after" a woman, the driver of the other vehicle involved in the incident, with a knife. Head then saw the defendant go after another man, who Head believed to be the driver's boyfriend, with a knife, getting to within five to six feet of the man. The defendant then approached Head, carrying his knife "just like he wanted to hit somebody else with it." As the defendant approached each of the three bystanders, he screamed "who else wants it?" or words to that effect. Head testified that he was "pretty scared for what [the defendant] might do" to him, and he planned to run away if the defendant attempted to stab him. Head then saw Officer Payne return to the scene with a gun. Head's testimony regarding the subsequent events mirrors that of Officer Payne's—Officer Payne identified himself as an officer, pointed his gun at the defendant, and ordered the defendant to drop his weapon, a woman stepped between the two men and begged the defendant to follow the officer's instructions, and the defendant dropped his knife before driving away.

Ashley Millington testified that she was the other driver involved in the incident which resulted in this case. She testified that she and her boyfriend, Michael Langston, had returned to the Arbors Apartments after visiting a local video store. As she was attempting to reposition her vehicle within a parking space, the defendant almost hit her car with his truck. The two drivers exchanged "a few choice words" before Officer Payne arrived and attempted to calm down the defendant. Although Millington testified that she only remembered "pieces" of the incident because she was running back and forth between the parking lot and a nearby hill, she did see the defendant and Officer Payne get into a physical confrontation, which ended with the defendant stabbing the officer and the officer running away from the defendant.

Millington testified that after Officer Payne ran from the defendant, the defendant moved

toward Langston, knife in hand. The defendant got "pretty close" to Langston and then asked Langston if he "wanted some." Langston replied "no" and then, in Millington's words, "backed up." The defendant then turned toward Millington, who ran up a hill because she was scared. Millington then saw Officer Payne return to the scene with a gun, at which point the defendant entered his truck and drove away.

Michael Langston testified that he was a passenger in Ashley Millington's vehicle the evening these events occurred. His testimony regarding the initial confrontation between the defendant and Millington and the subsequent confrontation between the defendant and Officer Payne was consistent with the testimony outlined above. He testified that he saw the defendant get out of his truck with a knife, which led to a physical confrontation between the defendant and Officer Payne. Langston saw the defendant stab Officer Payne, after which Officer Payne ran away. Langston testified that after the officer left the scene, the defendant "kind of lunged his knife" at another man while saying, "you want some?" Langston testified that the defendant then approached him and "stuck the knife at me and said, 'You want some?'" Langston, who interpreted the defendant's statement as an invitation to fight, replied, "no." The defendant then ran toward Millington, who ran up a hill. Langston then saw Officer Payne return to the scene with a gun and order the defendant to drop his knife. The defendant then dropped his weapon and drove away.

After Memphis police officers Casey Kirby, Daron Boyce, and John Richardson testified regarding the defendant's apprehension, the defendant testified on his own behalf. The defendant testified that on the evening in question, he was visiting a friend, Gerra Mulligan, at her apartment at the Arbors. The parking lot was full, so he parked in a handicapped space. After spending a short time at Mulligan's apartment, he returned to his vehicle to move it from the handicapped space. He saw a car with its reverse lights on, so he approached the car in an attempt to secure the space. The defendant honked his horn, the other car's driver honked her horn, and he drove away in an attempt to find another space. The defendant testified that as he circled back toward the other vehicle, the vehicle's passenger, Langston, made some "angry remarks" toward him. This led the defendant to respond verbally toward the passenger. The defendant claims that after a short exchange between he and Langston, Officer Payne punched him in the face through his truck's driver's side window. The defendant tried to get out of his truck, but Officer Payne shut the door on the defendant's ankle. The defendant claims that the officer punched him several more times, which led the defendant to stab the officer in self-defense.

The defendant testified that after Officer Payne ran away from the scene, he stood at his truck, stunned. He then saw Officer Payne return to the scene with the gun, threatening to shoot him. The defendant said that Mulligan approached the scene and told him to drop the knife. According to the defendant, the officer then threatened to shoot her as well. The defendant then dropped the knife and drove away.

On cross-examination, the defendant denied speeding through the parking lot, as had been alleged by the other witnesses. He also denied threatening any of the other bystanders after Officer Payne ran away from the scene. He also testified that Officer Payne never identified himself as a police officer during the incident, although he recalled that some of the bystanders may have said that Officer Payne was in fact an off-duty police officer.

Based on the above evidence, the jury convicted the defendant of the aggravated assault of Michael Langston and the misdemeanor assault of Joshua Head. The jury was unable to reach a verdict as to two of the other counts of the indictment, and a fifth count was not submitted to the jury. The state dismissed these three counts. The trial court sentenced the defendant to an effective sentence of fifteen years in the Department of Correction. This appeal follows.

## SUFFICIENCY OF EVIDENCE

The defendant contends that the evidence produced at trial was insufficient to support his convictions for aggravated assault and misdemeanor assault. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was convicted of one count of assault and one count of aggravated assault. Tennessee Code Annotated section 39-13-101 provides that a person commits assault by "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (2003). As relevant to this case, aggravated assault is committed when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . uses or displays a deadly weapon." Id. § 39-13-102(a)(1)(B).

Regarding the defendant's conviction for misdemeanor assault upon victim Head, Head testified that he witnessed the altercation between the defendant and Officer Payne, which ended when the defendant stabbed the officer. Head then witnessed the defendant walking around with a knife in his hand while screaming "who else wants it?" Head testified that the defendant asked him if he "wanted some," and Head testified that the defendant's actions made him "pretty scared about what [the defendant] might do." Langston also testified that the defendant approached Head with a knife and asked Head if he "wanted some." While the defendant testified that he did not threaten Head, the jury chose not believe this testimony, as was the jury's prerogative. We conclude that the evidence was sufficient for the jury to find the essential elements of misdemeanor assault beyond a reasonable doubt.

Regarding the defendant's conviction for aggravated assault upon victim Langston, we note that Langston did not testify that the defendant's actions put him in fear of imminent bodily injury. However, criminal convictions may be based exclusively on circumstantial evidence. See Pendergrass, 13 S.W.3d at 393. Our court has held that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury. Thus, the apprehension of imminent bodily harm may be inferred" from these surrounding circumstances. State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. at Jackson, May 8, 1998). In light of this rule, our court has affirmed several assault convictions in cases where the victim did not testify as to being placed in fear of imminent bodily injury. See generally State v. Larry Allen Whited, No. M2005-00167-CCA-R3-CD, 2006 WL 548228, at *11 (Tenn. Crim. App. Mar. 7, 2006) (citing to four other opinions reaching similar conclusion), app. denied, (Tenn. Aug. 28, 2006).

Of the cases in which this court has concluded that the jury correctly found that an assault victim reasonably feared imminent bodily injury despite the victim's failure to testify to that effect, two are particularly instructive. In State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 WL 32755555, at *6 (Tenn. Crim. App. Jan. 25, 2002), the defendant entered a residence, pointed a gun at two brothers, ages eleven and seven, who were seated together on a couch, and told the boys "If I can drop one, I can drop three," meaning the boys and their mother. The older brother, who was the only one to testify, said that the younger brother told the defendant to leave them alone, to which the defendant replied, "shut up." Id. Our court upheld the defendant's conviction, concluding that although the younger brother did not testify, the older brother's testimony was sufficient for the jury to "infer[] that [the younger brother] reasonably feared imminent bodily injury when the defendant turned the gun on [the younger brother] after threatening that he could easily 'drop' the three [family members]." In State v. James Albert Adams, No. M1998-00468-CCA-R3-CD, 1999 WL 1179580, at *3 (Tenn. Crim. App. Dec. 15, 1999), the victim testified that she entered her living room to see the defendant standing over her mother with a knife. The victim testified that she screamed at the defendant, asking him to stop hurting her mother, and she also pushed the defendant away. Id. The victim did not testify that she was afraid for her own safety, and she did not testify that the defendant threatened her with a knife, but our court affirmed the defendant's conviction, concluding that the jury could rationally infer that the victim feared for her own safety

when she witnessed the defendant wielding a deadly weapon toward another person in her immediate presence. Id. at *5.

In this case, Langston testified that he witnessed the altercation between the defendant and Officer Payne, and he also witnessed the defendant stab Officer Payne. He also testified that after the defendant stabbed the officer, he saw the defendant lunge at a bystander with a knife while saying, "you want some?" Langston testified that the defendant approached him, brandished a knife toward him, and asked Langston, "you want some?" Langston, who testified that he interpreted the defendant's statement as an invitation to fight, replied "no." Another witness, Head, testified that the defendant was five to six feet away from Langston when the defendant brandished the knife at Langston, and another witness, Millington, testified that Langston "backed up" when the defendant brandished the knife at him. In light of these circumstances, although Langston did not testify that the defendant's actions placed him in fear of imminent bodily injury, the jury could have rationally inferred that Langston was placed in such fear. The jury in this case did reach such a conclusion. This evidence was also sufficient for the jury to find that the defendant acted intentionally or knowingly and displayed a deadly weapon. Concluding that the evidence produced at trial was sufficient for the jury to find the defendant guilty of both offenses beyond a reasonable doubt, we deny the defendant relief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE